# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| THOMAS INDUSTRIES, INC.,<br>    *Plaintiff*,<br><br>v.<br><br>CITY OF BRISTOL, *et al.*,<br>    *Defendants*. | No. 3:12-cv-00733 (JAM) |

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This is an interpleader action brought by plaintiff Thomas Industries, Inc., to establish which claimants are entitled to the proceeds from the sale of certain machines formerly owned by BW Manufacturing, Inc. Defendants United States of America, Connecticut Department of Labor, and City of Bristol each claim statutory liens in the interpleaded funds. Defendant Chapman Machine Company, Inc., claims it is entitled to some of the interpleaded funds because it, rather than BW Manufacturing, Inc., owned certain machines that plaintiff sold. Plaintiff seeks attorney's fees from the interpleaded fund. For the reasons detailed below, I conclude that the United States of America is entitled to most of the interpleaded funds, that the Connecticut Department of Labor is entitled to some of the funds, and that plaintiff is entitled to an award of limited attorney's fees, but that the City of Bristol and Chapman Industries, Inc., are not entitled to any of the interpleaded funds.

### BACKGROUND

The material facts in this case are undisputed unless otherwise indicated. Gary Weed owned two businesses: BW Manufacturing, Inc. ("BW") and Chapman Machine Company, Inc. ("Chapman"). BW operated out of a warehouse in Bristol, Connecticut. Beginning in 2009, BW became delinquent on its tax obligations. BW failed to pay quarterly employee withholding taxes

1

for the quarterly tax periods ending on June 30, 2009, September 30, 2009, December 31, 2009, March 31, 2010, June 30, 2010, December 31, 2010, March 31, 2011, and June 30, 2011. As a result, the IRS made a number assessments: on September 21, 2009, for $138,343.00; on December 21, 2009, for $120,937.98; on April 5, 2010, for $80,072.79; on June 28, 2010, for $87,126.14; on September 20, 2010, for $59,910.52; on March 28, 2011, for $12,384.25; on June 20, 2011, for $7044.92; and on October 3, 2011, for $5,177.04. Doc. #140-2 at 2.

BW also failed to pay unemployment compensation contributions to the Connecticut Department of Labor ("DOL"). As a result, it made a number of assessments and filed liens against BW. First, it filed a lien on August 26, 2010, in the amount of $27,191.51 for the first and second quarters of 2010; on November 24, 2010, in the amount of $25.00 for the third quarter of 2010; on April 12, 2011, in the amount of $558.63 for the fourth quarter of 2010; and on September 28, 2011, in the amount of $7,251.33 for the first and second quarters of 2011 and a special assessment for 2010.[1] Doc. #15 at 1-2

BW also failed to pay personal property taxes to the City of Bristol ("City"). As a result, the City recorded tax liens on the personal property of BW Manufacturing on September 12, 2011, in the amount of $7,850.57, corrected to $15,701.14 plus accrued interest and fees on June 8, 2012; on September 13, 2011, in the amount of $20,852.50; and on February 6, 2012, in the amount of $58,982.50, corrected to $54,571.18 on June 8, 2012. Doc. #39-2 at 1-3.

In early 2012, Gary Weed contacted an auctioneer, plaintiff Thomas Industries, Inc., and proposed that plaintiff auction off some of BW's equipment. Weed acquiesced to a proposal stating that all of the machinery to be auctioned belonged to BW. A little more than a week before the auction, Weed notified plaintiff that not all of the machines were owned by BW and

---

[1] The liens filed with the Connecticut Secretary of the State dated November 24, 2010, and April 12, 2011, have been paid.

that the proceeds of the auction should be transferred to two different accounts. Doc. #153 at 11 (¶ 35). The auction took place on March 8, 2012, and yielded $729,519.13 in proceeds. After the auction, Weed claimed that nine of the machines were owned by Chapman and not BW. As a result, Chapman claims a right from the auction proceeds to $128,650.

On April 10, 2012, plaintiff filed this interpleader action in state court, naming the City of Bristol, Chapman Machine, Inc., the Connecticut Department of Labor, and the United States of America ("USA") as defendants. Doc. #1-2 at 2. The USA timely and properly removed the action to this Court on May 17, 2012. The City has since filed a cross-claim against all defendants, asserting a claim to some of the funds and asserting a claim to any money recoverable by Chapman. On February 1, 2013, the Court granted an interlocutory judgment of interpleader and ordered plaintiff to deposit $675,805.62 with the Clerk of Court. Doc. #105.[2] An initial round of summary judgment motions were denied in 2013. *See* Docs. # 108-10.[3] All parties except Chapman have now filed renewed motions for summary judgment, and plaintiff has also moved for an award of attorney's fees in connection with its fees for filing and litigating this interpleader action.

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who

---

[2] On January 2, 2018, the Court granted plaintiff's supplemental motion for interlocutory judgment of interpleader, directing plaintiff to deposit and additional $6,392.47 with the Clerk of Court. Doc. #146. As of August 22, 2018, the total value of the interpleaded fund including interest and deducting the registry fee is $694,081.
[3] No party argues that any arguments advanced by other parties are somehow precluded by the law of the case doctrine.

opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve contested issues of fact but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*); *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

As an initial matter, I address the basis for federal jurisdiction over this interpleader action. The parties' briefs presume that jurisdiction is predicated on the federal interpleader statute, 28 U.S.C. § 1335. That statute, however, requires two or more parties in the action to be diverse. *Id.* § 1335(a)(1). Here, there is no diversity of citizenship because each party is a citizen of Connecticut, and the USA is not a citizen for diversity purposes. *See Commercial Union Ins. Co. v. United States*, 999 F.2d 581, 584 (D.C. Cir. 1993). Although not stated in the state-court complaint, this interpleader action was presumably brought pursuant to Conn. Gen. Stat. § 52-484, the state interpleader statute. Nevertheless, this Court has jurisdiction because Congress has authorized the federal government to remove any interpleader action to federal court in which the government is party. *See* 28 U.S.C. §§ 1444, 2410(a)(5).

Whether this interpleader action is brought pursuant to 28 U.S.C. § 1335 or Conn. Gen. Stat. § 52-484, the analysis is the same. There must be real and genuine conflicting claims to the single fund. *See Metro. Life Ins. Co. v. Mitchell*, 966 F. Supp. 2d 97, 102 (E.D.N.Y. 2013); *Trikona Advisers Ltd. v. Haida Investments Ltd.*, 318 Conn. 476, 484 (2015). Then, "[t]he court should readily grant discharge of the [plaintiff] stakeholder, unless it finds that the stakeholder may be independently liable to a claimant or has failed to satisfy the various requirements of interpleader, including, when required, deposit of the stake." *New York Life Ins. Co. v.*

*Apostolidis*, 841 F. Supp. 2d 711, 720 (E.D.N.Y. 2012) (quoting *Moore's Federal Practice*); *Trikona Advisers*, 318 Conn. at 484. Next, "the Court adjudicates the claims among the remaining adverse parties." *Metro. Life Ins. Co.*, 966 F. Supp. 2d at 102; *Trikona Advisers*; 318 Conn. at 484. There is no dispute that there are genuine competing claims to the funds and that plaintiff should be discharged of liability.[4] The crux of this case is the priority of the competing claims to the fund, which is too small to satisfy all of the lienor defendants' claims.

*Chapman's Claims*

Chapman asserts a claim to the proceeds of nine machines that it alleges it owned prior to the auction. Plaintiff and the USA argue that Chapman is not entitled to the proceeds because it did not own the machines or was merely the alter ego of BW.

Initially, I conclude there is a genuine issue of material fact whether Chapman owned the nine machines that it claimed to own. On the one hand, there is evidence of record that the nine machines at issue were owned by BW. In 2005, BW represented that the nine machines were its property during an appraisal for a loan application. Doc. #140-10 at 4 (¶ 22). The property was physically located at BW's place of business. Doc. #140-4 at 3 (¶ 14). The property appeared in municipal tax declarations submitted by BW. Doc. #153 at 3. Prior to the auction, Weed represented in an email to plaintiff that all of the equipment to be sold was property of BW, and Weed acquiesced to a proposal by plaintiff that contemplated that all of the equipment was owned by BW. *Id.* at 10. Chapman never filed any personal property tax declarations stating it owned the equipment. *Id.* at 3.

---

[4] In its counterclaim against plaintiff, Chapman alleges negligence for plaintiff's failure to disburse to it the proceeds from the sale of the nine machines. Doc. #28. Plaintiff moved for summary judgment on Chapman's claims, and Chapman has not opposed plaintiff's motion. Chapman conceded at oral argument that it has abandoned its tort claims against plaintiff.

On the other hand, Weed indicated to plaintiff prior to the auction that some of the property did not belong to BW and that the proceeds should go to two separate accounts. Doc. #140-10 at 2 (¶ 9). Moreover, Chapman has submitted an affidavit from Weed stating that the nine machines at issue were owned by Chapman, not BW. Doc. #152-4 at 1. Before the auction, Weed indicated to a federal revenue officer that some of the property "belonged to a different company." Doc. #140-4 at 3 (¶ 14). Matters of ownership of personal property are generally questions of fact. *See Pratt v. Pond*, 45 Conn. 386, 388 (1877). And there is enough conflicting evidence in the record to create a genuine issue of material fact whether the nine machines at issue were owned by Chapman.

Nevertheless, the undisputed evidence clearly shows that Chapman was a mere alter ego of BW, regardless whether I apply federal law or state law to determine alter ego status. *See Southern New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 139 (2d Cir. 2010). The factors considered under federal law include: "(1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of business discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms-length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities." *Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*, 851 F. Supp. 2d 504, 509–10 (S.D.N.Y. 2012).

Under Connecticut law, a party seeking to hold another party liable as an alter ego under the "identity test" must establish "that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun." *Angelo Tomasso,*

*Inc. v. Armor Construction & Paving, Inc.*, 187 Conn. 544, 554 (1982). Courts look at factors including "overlapping ownership, officers, directors, personnel" and "common office space, address, [and] phones." *Naples v. Keystone Bldg. & Dev. Corp.*, 295 Conn. 214, 233 (2010).

Under both standards, I conclude that Chapman was an alter ego of BW. Chapman was physically located at the same address as BW, used the same phone number as BW, and shared the same officers. Doc. #153 at 3 (¶ 6). The property allegedly owned by Chapman was intermingled with BW property. Doc. #140-4 at 3 (¶ 14). There was intermingling of funds between the two entities. Doc. #153 at 4 (¶¶ 11-14). Chapman did not file an annual report during at least the five years prior to the auction, and did not file any property tax returns with the municipality. *Id.* at 3. (¶ 7). Chapman submits *no* evidence seeking to establish that Chapman operated independently.[5]

Based on this uncontroverted evidence, I conclude that there is no genuine issue of fact to dispute that Chapman was the alter ego of BW and liable for its obligations. *See Southern New England Tel. Co.*, 624 F.3d at 147. Therefore, even if Chapman owned the nine machines, the claimants' liens attached to the property. Accordingly, I conclude that Chapman is not entitled to any of the proceeds of the interpleader fund.[6]

---

[5] Chapman submitted an unexecuted affidavit stating that BW and Chapman are separate entities and sought a thirty-day extension of time from time from the Court to submit an executed affidavit. Doc. #156-1. The Court denied in part Chapman's motion for extension of time to execute the affidavit, and ordered that the affidavit be submitted within seven days. Doc. #157. Chapman never submitted an executed affidavit.

[6] Chapman claims that the alter ego argument is a new allegation not raised in the USA's pleadings. Alter ego status or a veil-piercing theory need not be specifically pleaded, so long as the party is on notice of such a claim. *See, e.g.*, *Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, 2016 WL 1267781, at *22 (S.D.N.Y. 2016); *Imagineering, Inc. v. Lukingbeal*, 1997 WL 363591, at *3 n.4 (S.D.N.Y. 1997) (citing *International Controls Corp. v. Vesco*, 490 F.2d 1334, 1351 (2d Cir. 1974)). Here, Chapman has been on notice since the USA filed its answer to the City of Bristol's cross-claim in January 2013 that it believed Chapman was the alter ego of BW. *See* Doc. #98 at 1.

*Lien Priority*

It is well established that when the determination of lien priority involves a federal tax lien, it is "federal law [that] determines the rights of priority among competing lienors." *Don King Prods., Inc. v. Thomas*, 945 F.2d 529, 534 (2d Cir. 1991). For any entity or category of lien that is not specifically listed in 26 U.S.C. § 6323 (and here none of the claimants or types of liens in this case are listed in § 6323), "priority as a lienor is determined by the common law rule of 'first in time is the first in right,'" and "[u]nder that rule, a federal tax lien takes priority over competing liens unless the competing lien was choate, or fully established, prior to the attachment of the federal lien." *Id.* at 533 (quoting *United States v. City of New Britain*, 347 U.S. 81, 87-88 (1954)). As a result, the USA enjoys a first-in-time-first-in-right priority to most of the interpleaded fund, *i.e.*, the amounts claimed in the USA tax assessments dated September 21, 2009, December 21, 2009, April 5, 2010, and June 28, 2010. Next, the Connecticut Department of Labor enjoys a priority over the USA and the City in its liens recorded on August 26, 2010, for unpaid unemployment compensation contributions.[7] The next in line for the remainder of the fund is the USA for its September 20, 2010, assessment of unpaid taxes.

The City argues that by the terms of Conn. Gen. Stat. § 12-195b, it enjoys a super-priority over all lienholders or at least the DOL. According to § 12-195b(b), a perfected municipal tax lien on personal property enjoys "priority over all previously perfected liens and security interests and other encumbrances of record under the Connecticut Uniform Commercial Code." This state statute, of course, does not permit the City to leapfrog the USA's first-in-time priority,

---

[7] The DOL and the USA disagree about whether the lien for unpaid unemployment contributions to the DOL for the first and second quarters of 2010 is superior to the federal tax lien arising from the assessment on June 28, 2010. The parties agree, however, that regardless of superiority of these competing liens, there are sufficient funds to pay the liens without diminishing the recovery of either party. I, too, agree. Therefore, the USA's lien arising from the assessment made on June 28, 2010, is deemed superior to the DOL's lien for unpaid unemployment contributions for the first and second quarters of 2010.

because it is federal law and not state law that governs the priority of liens when a federal tax lien is implicated. *See Don King Prods., Inc.*, 945 F.2d at 534.

Even assuming the state statute does not grant the City a super-priority over the USA, the City argues that the statute allows it to step into the shoes of and have priority over the DOL's prior liens. Doc. #150-2 at 9-10. This argument presumes that state law should govern the priority of two state-created tax liens. But "once the [federal] tax lien has attached to the taxpayer's state-created interests, we enter the province of federal law, which we have consistently held determines the priority of competing liens asserted against the taxpayer's property or rights to property." *Aquilino v. United States*, 363 U.S. 509, 513–14 (1960). The City has not pointed to any exception to this general rule, and the Court's research does not reveal any.

Moreover, even if state law were applicable, I am not convinced that § 12-195b gives a super-priority to municipal liens on personal property over statutory state tax liens. The statute gives priority to liens, security interests, and other encumbrances of record "under the Connecticut Uniform Commercial Code." Conn. Gen. Stat. § 12-195b(b). The statute says nothing about priority over statutorily created tax liens. In sum, the City's liens do not have priority over the previously perfected liens of the USA or the DOL.

For its part, the DOL argues that it is entitled to the funds to satisfy its liens securing unpaid taxes for the first and second quarters of 2011 and a 2010 special assessment, because the DOL *filed* its liens with the Secretary of the State before the USA *filed* its federal tax liens with the Secretary of the State. I do not agree. "A federal tax lien, described as a 'secret lien,' is effective *upon assessment* against all persons, even in the absence of recordation of the lien." *Don King Prods., Inc.*, 945 F.2d at 533 (emphasis added). The DOL filed its lien on September

28, 2011, after the USA had already made assessments on September 20, 2010, March 28, 2011, and June 20, 2011. The DOL's liens are inferior to the liens arising from those prior assessments.

### *Attorney's Fees*

Plaintiff seeks attorney's fees totaling $37,113.98. According to the Connecticut interpleader statute, a court may award attorney's fees. *See* Conn. Gen. Stat. § 52-484. Generally speaking, a reasonable award of fees and costs to a plaintiff in an interpleader case is appropriate if plaintiff is "(1) a disinterested stakeholder, (2) who had conceded liability, (3) has deposited the disputed funds into court, and (4) has sought a discharge from liability." *Septembertide Pub., B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 683 (2d Cir. 1989). The parties do not dispute that these elements are satisfied. Plaintiff concedes, however, that its claim for attorney's fees from the interpleaded fund cannot diminish the recovery of the USA on its federal tax liens. *See United States v. State Nat. Bank of Conn.*, 421 F.2d 519, 521 (2d Cir. 1970); *Advantage Title Agency, Inc. v. Rosen*, 297 F. Supp. 2d 536, 539 (E.D.N.Y. 2003) (citing *United States v. Equitable Life Assurance Society of United States*, 384 U.S. 323, 328 (1966)).

Therefore, if plaintiff recovers any attorney's fees, these fees must come from the portion of interpleaded funds to be awarded to the DOL. Some courts have extended the rule protecting the federal government's recovery to the States. *See, e.g.*, *Hinkley & Donovan v. Paine*, 424 F. Supp. 1013, 1021 (D.N.H. 1977) (extending rule to state entity without discussion); *but see Pilots Ass'n for Bay & River Delaware v. U.S. Dep't of Treasury*, 1987 WL 18692, at *2 n.1 (D. Del. 1987) (disagreeing with *Hinkley & Donovan*). At least one court in this circuit has followed *Hinkley & Donovan* and explained that, in a battle between the state coffer and a disinterested stakeholder ensnared in an interpleader action, equity favors the public fisc given that the

stakeholder, an escrow agent, could have taken precautions to ensure it was paid for its middle-man duties. *See Cohen v. A. Oriel Co.*, 1985 WL 2523, at *2 (S.D.N.Y. 1985).

Courts are also reluctant to award attorney's fees to an interpleading plaintiff if such fees are part of the ordinary and expected course of plaintiff's business. *See Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 320 (S.D.N.Y. 2014). "This is particularly true in the case of insurance companies, where minor problems that arise in the payment of insurance policies must be expected and the expenses incurred are part of the ordinary course of business." *Ibid.* (quotation marks omitted). Likewise, auctioneers such as plaintiff have also long found themselves subject to competing claims necessitating a resort to interpleader. *See, e.g.*, *Bleeker v. Graham*, 2 Edw. Ch. 647 (N.Y. Ch. 1836); *see also Sotheby's, Inc. v. Shene*, 2005 WL 3533138, at *1 (S.D.N.Y. 2005) (auctioneer brought interpleader to resolve a dispute over artwork). Plaintiff here had advance notice of competing claims in view of the fact that the government claimants filed liens on the public record before plaintiff was engaged to auction the machines and accept a fee for its services.

Balancing these considerations, I conclude that plaintiff should receive a modest attorney's fee award for the reasonable costs it incurred by resorting to the filing of an interpleader action. The bulk of plaintiff's accrued legal fees in this case are, in large part, a consequence of its inability to secure a discharge in light of Chapman's counterclaim—a cost that should not be borne by the DOL.

Accordingly, plaintiff is awarded $5,000 in attorney's fees. The Court concludes that this is a reasonable fee award for bringing the type of interpleader action filed here. *See, e.g.*, *Lyle v. James*, 2014 WL 2881405, at *8 (D. Conn. 2014) (awarding $2,940.84 in attorney's fees to plaintiff in an interpleader action).

## Conclusion

For the reasons stated above, the United States of America's Motion for Summary Judgment (Doc. #140) is GRANTED. Plaintiff's Motion for Summary Judgment on Chapman Industries, Inc.'s counterclaims (Doc. #147) is GRANTED. The City of Bristol's Motion for Summary Judgment (Doc. #150) is DENIED. The Connecticut Department of Labor's Motion for Summary Judgment (Doc. #154) is GRANTED in part and DENIED in part. Plaintiff's Motion for Attorney's Fees (Doc. #168) is GRANTED in part and DENIED in part.

The Court orders that the interpleaded funds be disbursed in the following priority: first to the United States of America on its claims arising out of liens for tax assessments made on September 21, 2009, December 21, 2009, April 5, 2010, and June 28, 2010; second to the Connecticut Department of Labor for claims arising out of the lien recorded on August 26, 2010, for unpaid unemployment compensation contributions for the first and second quarters of 2010; third to the USA for its claim arising out of the tax assessment made on September 20, 2010. The Court awards plaintiff $5,000 in attorney's fees, which sum shall be deducted from the recovery of the DOL. The interpleaded funds being depleted after payment on these claims, there will be no further recovery. The City of Bristol and Chapman Industries, Inc., are not entitled to any recovery.

For preparation of the judgment of the Court, the USA and the DOL shall file statements of the present value of their claims on the docket by September 5, 2018. Thereafter, the Court will enter judgment ordering the Clerk to disburse the interpleaded funds consistent with this ruling.

It is so ordered.

Dated at New Haven this 25th day of August 2018.

                                                    /s/ *Jeffrey Alker Meyer*
                                                  Jeffrey Alker Meyer
                                                  United States District Judge